# SUPREME COURT OF THE UNITED STATES

No. 24A831

DEPARTMENT OF STATE, ET AL. *v.* AIDS VACCINE
ADVOCACY COALITION, ET AL.

ON APPLICATION TO VACATE THE ORDER ISSUED BY
THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

[March 5, 2025]

On February 13, the United States District Court for the District of Columbia entered a temporary restraining order enjoining the Government from enforcing directives pausing disbursements of foreign development assistance funds. The present application does not challenge the Government's obligation to follow that order. On February 25, the District Court ordered the Government to issue payments for a portion of the paused disbursements—those owed for work already completed before the issuance of the District Court's temporary restraining order—by 11:59 p.m. on February 26. Several hours before that deadline, the Government filed this application to vacate the District Court's February 25 order and requested an immediate administrative stay. THE CHIEF JUSTICE entered an administrative stay shortly before the 11:59 p.m. deadline and subsequently referred the application to the Court. The application is denied. Given that the deadline in the challenged order has now passed, and in light of the ongoing preliminary injunction proceedings, the District Court should clarify what obligations the Government must fulfill to ensure compliance with the temporary restraining order, with due regard for the feasibility of any compliance timelines. The order heretofore entered by THE CHIEF JUSTICE is vacated.

JUSTICE ALITO, with whom JUSTICE THOMAS, JUSTICE GORSUCH, and JUSTICE KAVANAUGH join, dissenting from the denial of the application to vacate order.

Does a single district-court judge who likely lacks jurisdiction have the unchecked power to compel the Government of the United States to pay out (and probably lose forever) 2 billion taxpayer dollars?  The answer to that question should be an emphatic "No," but a majority of this Court apparently thinks otherwise.  I am stunned.

I

In capsule form, this is what happened.  Respondents are a group of American businesses and nonprofits that receive foreign-assistance funds from the State Department and the U. S. Agency for International Development.  They brought suit and claimed that the current administration's temporary pause of foreign-assistance payments is unlawful.  On February 13, 2025, the District Court issued a temporary restraining order (TRO) requiring the Government to halt its funding pause.  It based that decision on a finding that respondents are likely to succeed in showing that the Government violated the Administrative Procedure Act (APA).  After issuing the TRO, the District Judge grew frustrated with the pace at which funds were being disbursed, and on February 25, he issued a second order requiring the Government to pay out approximately $2 billion.  The judge brushed aside the Government's argument that sovereign immunity barred this enforcement order, and he took two steps that, unless corrected, would prevent any higher court from reviewing and possibly stopping the payments.  First, he labeled the order as a non-appealable TRO, and second, he demanded that the money be paid within 36 hours.

This left the Government little time to try to obtain some review of what it regarded as a lawless order.  The Government moved for a stay pending appeal in the District Court.  But the judge shrugged off the Government's sovereign-

immunity argument and ignored the Government's representation that most of the money in question, once disbursed, could probably not be recovered. See App. to Application to Vacate Order 93a.

The Government quickly filed an appeal in the United States Court of Appeals for the District of Columbia. But, with only four hours to spare before the payment deadline, the D. C. Circuit dismissed the Government's appeal because it took the District Court's "TRO" label at face value and determined it lacked appellate jurisdiction.

With nowhere else to turn and the deadline fast approaching, the Government asked this Court to intervene. At the last moment, THE CHIEF JUSTICE issued an administrative stay. Unfortunately, a majority has now undone that stay. As a result, the Government must apparently pay the $2 billion posthaste—not because the law requires it, but simply because a District Judge so ordered. As the Nation's highest court, we have a duty to ensure that the power entrusted to federal judges by the Constitution is not abused. Today, the Court fails to carry out that responsibility.

## II

Time does not allow a lengthy discussion of the legal issues presented by this case, but a brief summary suffices to show that the District Court's order should be vacated or, at the very least, stayed.

To start, it is clear that the District Court's enforcement order should be construed as an appealable preliminary injunction, not a mere TRO. A TRO, as its name suggests, is "temporary," and its proper role is to "restrain" challenged conduct for a short time while the court considers whether more lasting relief is warranted. See 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3922.1 (3d ed. 2012). The order here, which commanded the payment of a vast sum that in all likelihood can never be fully

recovered, is in no sense "temporary." Nor did the order merely "restrain" the Government's challenged action in order to "preserve the status quo." *Northeast Ohio Coalition for Homeless and Serv. Employees Int'l Union, Local 1199* v. *Blackwell*, 467 F. 3d 999, 1006 (CA6 2006). Rather, it "act[s] as a mandatory injunction requiring affirmative action" by the Government. *Ibid.* And given its likely irreversibility, the District Court's enforcement order effectively gave respondents a portion of the ultimate relief they seek.

For these reasons, the Court of Appeals had jurisdiction to consider the Government's appeal, and we have jurisdiction to review and summarily vacate that court's erroneous judgment.

## III

Even if the majority is unwilling to vacate the District Court's order, it should at least stay the District Court's enforcement order until the Government is able to petition for a writ of certiorari. In considering whether to issue such a stay, we ask, at a minimum, (1) whether the moving party is likely to prevail on the merits and (2) whether that moving party is likely to suffer irreparable harm.* See *Nken* v. *Holder*, 556 U. S. 418, 425 (2009); *Grupo Mexicano de Desarrollo, S. A.* v. *Alliance Bond Fund, Inc.*, 527 U. S. 308, 327 (1999). In "close cases," we also take into account other

——————

*To the extent that likelihood of certiorari is a relevant factor, *John Does 1–3* v. *Mills*, 595 U. S ___, ___ (2021) (BARRETT, J., concurring in the denial of application for injunctive relief) (slip op., at 1), it is met here. Recent years have seen a sharp increase in district-court orders enjoining important Government initiatives, and some of these have been labeled as unappealable TROs. See *Dellinger* v. *Bessent*, 2025 WL 559669 (CADC, Feb. 15, 2025); *id.*, at *10–*17 (Katsas, J., dissenting). Clarification of the standards for distinguishing between a TRO and a preliminary injunction is a matter that deserves this Court's attention at the present time. The same is true regarding the scope of the APA's waiver of sovereign immunity.

equitable considerations. *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*). Here, these factors weigh in favor of a stay.

*Likelihood of success.* The Government has shown a likelihood of success on the merits of its argument that sovereign immunity deprived the District Court of jurisdiction to enter its enforcement order.

Sovereign immunity bars "a suit by private parties seeking to impose a liability which must be paid from public funds in the . . . treasury." *Edelman* v. *Jordan*, 415 U. S. 651, 663 (1974). But that is exactly what the District Court ordered here. See App. to Application to Vacate Order 85a–86a ("[T]he restrained defendants shall pay all invoices and letter of credit drawdown requests on all contracts for work completed prior to the entry of the Court's TRO on February 13").

Sovereign immunity may be waived, but "[t]o sustain a claim that the Government is liable for awards of monetary damages, the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Lane* v. *Peña*, 518 U. S. 187, 192 (1996). Attempting to satisfy this strict requirement, respondents point to the APA's waiver of sovereign immunity for certain actions "seeking relief other than money damages." 5 U. S. C. §702. That language, as we have explained, distinguishes "between specific relief," which is permitted under the APA, and "compensatory, or substitute, relief," which is not. *Department of Army* v. *Blue Fox, Inc.*, 525 U. S. 255, 261 (1999). But the relief here more closely resembles a compensatory money judgment rather than an order for specific relief that might have been available in equity. See *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 210–211 (2002) ("[A]n injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity"). Sovereign immunity thus appears to bar the sort of compensatory relief that the

District Court ordered here.

Hoping to escape that conclusion, respondents point to *Bowen* v. *Massachusetts*, 487 U. S. 879 (1988). In that case, we held that the APA's waiver of sovereign immunity covered a District Court's judgment reversing a final order of the Secretary of Health and Human Services refusing to reimburse Massachusetts for certain Medicaid expenditures. Unlike the District Court's order here, that "judgment did not purport to . . . order that any payment be made" by the United States. *Id.*, at 888. Rather, *Bowen* simply recognized a basic reality of APA review: after a court sets aside an agency action, a natural consequence may be the release of funds to the plaintiff down the road. Indeed, we have since clarified that "*Bowen* has no bearing on the unavailability of an injunction to enforce a contractual obligation to pay money past due"—the sort of relief that appears to have been ordered here. *Knudson*, 534 U. S., at 212.

The District Court, however, failed to mention (much less reckon with) *Bowen* or *Knudson* before plowing ahead with its $2 billion order. Nor did it take account of our previous suggestion that the proper remedy for an agency's recalcitrant failure to pay out may be to "seek specific sums already calculated" and "past due" in the Court of Federal Claims. *Maine Community Health Options* v. *United States*, 590 U. S. 296, 327 (2020); *Bowen*, 487 U. S., at 890, n. 13 (invoking the First Circuit's suggestion that if an agency "'persist[s] in withholding reimbursement for reasons inconsistent with our decision'" under the APA, the "'remedy would be a suit for money past due under the Tucker Act in the Claims Court'"). The most that can be said is that in the District Court's denial of the Government's motion for a stay pending appeal, it cited but did not analyze a handful of cases echoing *Bowen*'s discussion of the APA's conscribed waiver of sovereign immunity. One might expect more care from a federal court before it so blithely discards "sovereign dignity." *Alden* v. *Maine*, 527 U. S. 706,

715 (1999).

Finally, the Government has a strong argument that the District Court's order violates the principle that a federal court may not issue an equitable remedy that is "more burdensome to the defendant than necessary to" redress the plaintiff's injuries. *Califano* v. *Yamasaki*, 442 U. S. 682, 702 (1979). In this case, the District Court's enforcement order functions as a "universal injunction def[ying] these foundational" limits on equitable jurisdiction. *Labrador* v. *Poe*, 601 U. S. \_\_\_, \_\_\_ (2024) (GORSUCH, J., concurring in grant of stay) (slip op., at 5). The District Court ordered the Government to "pay all invoices and letter of credit drawdown requests on all contracts" for pre-TRO work completed. App. to Application to Vacate Order 86a. That order encompasses more than just respondents, and the District Court offered no reason why universal relief to nonparties is appropriate here. And this is not the sort of case in which only universal relief is feasible. Even supposing the APA allows universal vacatur of rules in some circumstances, the District Court's order of direct monetary payment bears no resemblance to that. *Cf. Griffin* v. *HM Florida-Orl, LLC*, 601 U. S. \_\_\_, \_\_\_, n. 1 (2023) (KAVANAUGH, J., respecting denial of application for stay) (slip op., at 3, n. 1.). And nobody has suggested that the Government is unable to identify respondents' allegedly owed funds and pay out only to them. Limiting the scope of relief in that manner would be significant. Below, the Government represented respondents seek roughly $250 million—still a large figure, but a fraction of the $2 billion ordered. Emergency Motion for Immediate Administrative Stay and for Stay Pending Appeal in No. 25-5046 etc. (CADC), p. 9.

*Harm to the parties and others.* The Government has shown that it is likely to suffer irreparable harm if the District Court's order is not stayed. The Government has represented that it would probably be unable to recover much of the money after it is paid because it would be quickly

spent by the recipients or disbursed to third parties. Respondents did not credibly dispute this representation, and the District Court did not find that it is incorrect.

We usually "balance the equities and weigh the relative harms" in "close cases." *Hollingsworth*, 558 U. S., at 190. For the reasons I have explained, this is not such a case, and our analysis could end there. Nevertheless, respondents' equitable arguments are insufficient to justify the denial of a stay. They contend that the failure to pay the money in question would cause them irreparable harm because without those funds, they could not continue to operate or would have to reduce the work they do. As a result, they claim, recipients of their services would suffer. These potential consequences are, of course, serious. But any harm resulting from the failure to pay amounts that the law requires would have been diminished, if not eliminated, if the Court of Appeals had promptly decided the merits of the Government's appeal, which it should not have dismissed. If we sent this case back to the Court of Appeals, it could still render a prompt decision. If it decided in favor of respondents, the Government would be obligated to pay all the money that is due, and respondents would have suffered only a short delay in the receipt of payments. And if the Government prevailed on its sovereign-immunity argument, neither respondents nor any of the recipients of their services would have suffered any unlawful consequences.

In sum, the factors we consider in deciding whether to issue a stay weigh strongly in favor of granting that relief.

*    *    *

Today, the Court makes a most unfortunate misstep that rewards an act of judicial hubris and imposes a $2 billion penalty on American taxpayers. The District Court has made plain its frustration with the Government, and respondents raise serious concerns about nonpayment for completed work. But the relief ordered is, quite simply, too

extreme a response. A federal court has many tools to address a party's supposed nonfeasance. Self-aggrandizement of its jurisdiction is not one of them. I would chart a different path than the Court does today, so I must respectfully dissent.