LUCERO, Circuit Judge,
concurring in part and dissenting in part.'
My colleagues in the majority conclude that our longstanding circuit precedent allowing courts to consider the four preliminary injunction factors in a holistic fashion has been impliedly overruled by Winter v. Natural Resources Defense Council, 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d. 249 (2008). (Majority Op. 1281-83.) I disagree that the Supreme Court has sub silentio reversed a decades-old standard used by a majority of circuits. Accordingly, I respectfully dissent in part.
I
For more than fifty years, we have held that a plaintiff may obtain a preliminary injunction without showing its
right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i.e., the balance of hardships tips decidedly *1286 toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a. fair ground for litigation and thus for more deliberate investigation.
Cont’l Oil Co. v. Frontier Ref. Co., 338 F.2d 780, 781-82 (10th Cir. 1964) (per cu-riam). In its more recent formulation, we have stated a movant who demonstrates that the remaining three preliminary injunction factors “tip, strongly in his favor ... may meet the requirement for showing success on the merits by showing that questions going to the merits are , so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.” Davis v. Mineta, 302 F.3d 1104, 1111 (10th Cir. 2002) (quotation omitted). A majority of our sibling circuits have adopted a similar test. See Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 36 n.5 (2d Cir. 2010) (collecting ’ cases). Courts refer to this standard as the “serious questions” test, which is one version of the “sliding scale” approach to preliminary injunctions. See Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131 (9th Cir. 2011).
This common sense approach reflects the need to provide district courts with flexibility to maintain the status quo when confronted with difficult .cases that will surely result in irreparable harm. Ruling on a motion for a preliminary injunction “is often a delicate and difficult balancing act, with complex factual scenarios teed up on an expedited basis, and supported only by limited discovery,” making it “seem almost inimical to good judging to hazard a prediction about which side is likely to succeed.” Alliance for the Wild Rockies, 632 F.3d at 1139-40 (Mosman, J., concurring); see also Univ. of Tex. v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (because preliminary injunctions are “customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits,” we do not require a moving party to “prove his case in full”). Our court has cautioned that such rulings are often “based on an abbreviated record and made without the benefit of full briefing and oral argument,” rendering them “tentative in nature and not binding at a subsequent trial on the merits.” Homans v. City of Albuquerque, 366 F.3d 900, 904-05 (10th Cir. 2004).
Requiring a movant threatened with imminent, irreparable injury to prove a probability of success on this expedited basis ignores the practical realities of litigation. “The very purpose of an injunction ... is to give temporary relief based on a preliminary estimate of the strength of plaintiffs suit.... Limiting the preliminary injunction to cases that do not present significant difficulties would deprive the remedy of much of its utility.” Citigroup, 598 F.3d at 35-36 (quoting 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedure § 2948.3 (2d ed. 2009)). In exercising equitable discretion over motions for temporary relief, courts cannot woodenly employ a one size fits all mindset. “Equity eschews mechanical rules; it depends on flexibility.” Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946); see also Vaughan v. John C. Winston Co., 83 F.2d 370, 373 (10th Cir. 1936) (“Equity is efficient because its remedies are flexible, and may be adapted to the needs of the occasion.”).
With these principles in mind, it seems to me the majority reads too much into Winter. In doing so, they take the minority position among circuits to have considered the issue. See Alliance for the Wild Rock *1287 ies, 682 F.3d at 1134-35 (holding that a “serious questions” version of the sliding scale approach to preliminary injunctions survives Winter); Citigroup, 598 F.3d at 35-38 (2d Cir. 2010) (same); Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009) (same); see also Revel AC, Inc. v. IDEA Boardwalk LLC, 802 F.3d 558, 569-71 (3d Cir. 2015) (applying sliding scale test for a stay pending appeal post-Winter). But see Pashby v. Delia, 709 F.3d 307, 320-21 (4th Cir. 2013) (concluding Winter impliedly overruled any sliding scale approach).
I agree with the majority view among the circuits. It would be surprising if the Supreme Court, without comment, “eliminated the longstanding discretion of a district judge to preserve the status quo with provisional relief until the merits could be sorted out in cases where clear irreparable injury would otherwise result and at least serious questions going to the merits are raised.” Alliance for the Wild Rockies, 632 F.3d at 1134 (quotation and italics omitted). Had the Court intended “to abrogate the more flexible standard for a preliminary injunction, one would expect some reference to the considerable history of the flexible standards applied in this circuit, seven of our sister circuits, and- in the Supreme Court itself.” Citigroup, 598 F.3d at 38; see also id. at 38 n.8 (explaining that the standards for a stay and a preliminary injunction are similar, and the Supreme Court stated in Hollingsworth v. Perry, 558 U.S. 183, 190, 130 S.Ct. 705, 175 L.Ed.2d 657 (2010) (per curiam), which was post-Winter, that a stay pending disposition of a petition for writ of certiorari requires only a “reasonable probability” that certiorari will be granted).
Yet nothing in the text of the Winter majority opinion indicates that a sliding scale approach is impermissible. See Winter, 555 U.S. at 51, 129 S.Ct. 365 (Ginsburg, J., dissenting) (noting that “courts have evaluated claims for equitable relief on a ‘sliding scale’” and that the “Court has never rejected that formulation, and I do not believe it does so toda/’). The Court recited the ordinary preliminary injunction standard, stating that “[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.” Winter, 555 U.S. at 20, 129 S.Ct. 365. It also stated that the Ninth Circuit test at issue was inconsistent with the requirement that a movant make a “clear showing” of its right to relief. Id. at 22, 129 S.Ct. 365. But neither of these statements is novel; both have coexisted with our serious questions, sliding scale test for many years. See, e.g., Doran v. Salem Inn, Inc., 422 U.S. 922, 931, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975) (describing the ordinary preliminary injunction standard); SCFC ILC, Inc. v. VISA USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991) (noting the “clear showing” requirement). For example, in Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234 (10th Cir. 2001), we noted both the ordinary preliminary injunction test and the clear showing standard, and nevertheless applied the serious questions test.' Id. at 1246, 1253. It cannot be the case that these statements in Winter' overruled our traditional approach.
As I read Winter, the Court took exception to the Ninth Circuit’s rule that a movant could obtain a preliminary injunction by showing a “possibility” of irreparable harm. 555 U.S. at 21, 129 S.Ct. 365. It expressly stated that this “standard is too lenient.” Id. at 22, 129 S.Ct. 365. Such a rule runs counter to the “basic doctrine of equity jurisprudence that courts of equity *1288 should not act ... when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief.” Younger v. Harris, 401 U.S. 37, 43-44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); see also Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) (“The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.”).
But our circuit precedent does not permit a party to obtain equitable relief by showing a mere “possibility” of success on the merits. Instead, a movant must demonstrate “that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation.” Davis, 302 F.3d at 1111. This is far from the toothless “possibility” threshold rejected in Winter. The serious questions standard has been interpreted to require “at least a reasonable probability of success on the merits.” Winnemucca Indian Colony v. U.S. ex rel. Dep’t of the Interior, 837 F.Supp.2d 1184, 1190 (D. Nev. 2011). This is the same degree of probability utilized by the Supreme Court post-Winter in ruling on stay motions. Hollingsworth, 558 U.S. at 190, 130 S.Ct, 705. Further still, “[bjecause the moving party must not only show that there are serious questions going to the merits, but must additionally establish that the balance of hardships tips decidedly in its favor, its overall burden is no lighter than the one it bears under the likelihood of success standard.” Citigroup, 598 F.3d at 35 (quotation, citation, and emphasis omitted).
In a different context, when tasked with deciding whether a traditional approach to equitable relief had been overruled, the Supreme Court explained that
[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims. We do not believe that such a major departure from that long tradition as is here proposed should be lightly implied.
Hecht Co. v. Bowles, 321 U.S. 321, 329-30, 64 S.Ct. 587, 88 L.Ed. 754 (1944), The same is true in this instance. I dissent from the majority’s conclusion that Winter overruled our traditional approach to preliminary injunctions.
II
Despite my disagreement with the majority’s mode of analysis, I concur in its ultimate resolution of the case. I would hold that plaintiffs have failed to demonstrate that they are sufficiently likely to prevail on the merits even under the serious questions standard, assuming that the remaining factors tip strongly in their favor. The majority opinion .cogently explains the shortcomings in plaintiffs’ arguments, and I will not repeat its analysis here. However, I wish to make a few points explaining my view that plaintiffs fail even under a lesser standard.
Plaintiffs argue that the 2003 Environmental Impact Statement (“EIS”) considers impacts of vertical wells in the northern portion of the San Juan Basin rather than horizontal drilling in the southern portion, and thus the BLM has not adequately considered the cumulative impacts of the challenged drilling. But .this argument fundamentally mischaracterizes the 2003 EIS, which is concerned with total *1289 impacts across the basin—not sub-regional impacts.
Although the '2003 EIS assumes that most development will occur in the “high development area” of the basin, it specifically explains that it is intended to provide “a broad scale, ‘big picture’ level of analysis” because “the exact locations of projected oil and gas development and other changes are not known at this time.” The EIS provides estimates for the total impacts of drilling across the entire New Mexico portion of the basin, including the number of new wells on federal land, miles of new road, long- and short-term surface disturbance, vegetation loss, impact on sensitive species, effect on cultural resources, and total net change in emission of volatile organic compounds, carbon dioxide, and particulate matter. And the cumulative impacts section again notes that it provides a “more general” analysis because “decisions about other actions in the planning area would be made by many public and private entities, and the location, timing, and magnitude of these actions are not well known.”
In contrast, the Environmental Assessments (“EAs”) focus on site-specific impacts. They provide estimates for greenhouse gasses, criteria air pollutants, and volatile organic compounds for each approved well, along with site-specific discussions of soil, groundwater, wildlife, cultural, and visual resources. The EAs also provide annual emissions totals by county. However, they refer to the 2003 EIS for a more detailed discussion of cumulative impacts with respect to the entire portion of the San Juan Basin in New Mexico.'
Importantly, plaintiffs do not argue that the total impacts of drilling in the basin have exceeded the total impacts predicted in the 2003 EIS. Instead, they argue that tiering to the 2003 EIS is impermissible because horizontally drilled wells have greater impacts than vertically drilled wells on a well-by-well basis (specifically referencing air pollutant emissions, surface disruptions, volatile organic compounds, water use, and noise impacts). But the individual impacts of wells are considered in the EAs, not in the EIS. And plaintiffs have not shown that the analysis of total impacts contained in the EIS is invalid. It appears undisputed that the total number of wells drilled in the basin remains far below the number projected in 2003. And both short-term and long-term surface disturbances have been lower than predicted.
Plaintiffs also make much ■ of the fact that the BLM has elected to amend the 2003 Resource Management Plan (“RMP”) to “address the impacts of changing patterns of oil and gas development that have occurred since its publication.” But National Environmental Policy Act (“NEPA”) regulations make clear that an agency may continue to act pursuant to an RMP “[djuring the preparation of a program or plan NEPA document ... when that action is -within the scope of, and analyzed in, an existing NEPA document.” 43 C.F.R. § 46.160. This would be a much different case if plaintiffs had shown—or even argued—that total impacts had surpassed those predicted. But because the total impacts of drilling in the New Mexico portion of the San Juan Basin remain within the scope of the 2003 EIS, suspension of activities under that plan is not required. See 40 C.F.R. § 1506.1(c) (requiring suspension of agency action if “the action is not covered by an existing program statement”).
Essentially, plaintiffs argue that the BLM may not tier to the 2003 EIS—even though its estimates of total impacts have thus far proven overly conservative—because the site-specific impacts of horizontal wells differ from the site-specific impacts of vertically drilled wells. Yet they have not identified any defect in the site-specific *1290 analyses contained in the EAs. Although there may be some possibility that plaintiffs will prevail upon a full presentation of their case, I would hold that their argument falls short of establishing serious questions as to whether the BLM acted in an arbitrary and capricious manner.